UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

MATTHEW LEE ROBINSON, #421041,   )
        )
        Petitioner,   )    Case No. 1:09-cv-252
        )
v.         )    Honorable Paul L. Maloney
        )
BLAINE LAFLER,         )
        )    **REPORT AND RECOMMENDATION**
        Respondent.   )
_____)

      This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.
§ 2254. Petitioner's convictions stem from the armed robbery of a convenience store in Kent
County, Michigan, on August 23, 2005. On January 19, 2007, a Kent County Circuit Court jury
convicted petitioner of two counts of armed robbery. MICH. COMP. LAWS § 750.529. On April 12,
2007, the trial court sentenced petitioner to concurrent terms of 33-to-50 years on each count,
enhanced by petitioner's status as a fourth-felony offender. MICH. COMP. LAWS § 769.12. Petitioner
raised two claims on direct appeal: (1) a due-process violation arising from an impermissibly
suggestive pretrial identification (and accompanying ineffective assistance of trial counsel for failing
to move to suppress the identification); and (2) a due-process violation arising from the prosecutor's
failure to disclose exculpatory evidence. The Michigan Court of Appeals analyzed and rejected these
two issues in a *per curiam* opinion issued July 1, 2008. The Michigan Supreme Court denied leave
to appeal by standard order entered October 27, 2008. Petitioner initiated this habeas corpus action
by filing a *pro se* petition on March 19, 2009. The petition asserts the same two issues raised on

direct appeal. Respondent argues that the petition should be denied for lack of merit. (Answer, docket # 8). Upon review, I recommend that the petition be denied for lack of merit in all grounds raised.

## Proposed Findings of Fact

**A.    Trial**

Petitioner's trial began on January 17, 2007. (TT I, docket # 12). DeLynn Regan testified that on the night of August 23, 2005, she was working at a convenience store located in rural Kent County, Michigan. Mrs. Regan was not paid for her work, but was helping out her daughter, who owned the store. (TT II, 16-17, 32-33, docket # 13). Raymond Regan, DeLynn's husband, came down to the store to help her at the close of business. (TT II, 33). Among other things, closing the store involved counting out the money, setting up the cash drawer for the next day's business, and preparing a bank deposit. (TT II, 17). DeLynn and Raymond Regan believed that it would be safer at closing time if they were together. (TT II, 15-18, 33). Mr. Regan, age 62, was a retired heavy equipment mechanic. (TT II, 33). He was also a licenced instructor for persons seeking a permit to carry a concealed weapon. (TT II, 55-56).

The store closed for business at 10 p.m. A few minutes later, Mr. and Mrs. Regan were standing next to each other behind the counter and in the process of counting the money from the cash register. (TT II, 18). The area was well lit from a "four-foot long fluorescent light right over the counter." (TT II, 47, 57). A white male, approximately six feet tall, with reddish colored hair and a light complexion, entered the store. The man was armed with a silver semi-automatic handgun and was carrying a duffle bag. He was wearing a black hooded sweatshirt and attempted

to conceal his identity by covering part of his face with the hood.  He was wearing gloves.  The man reached out and put the gun to Mrs. Regan's head, demanding that she put all the money in the duffel bag.  (TT II, 18-20, 34-35, 57, 62).  He kept saying, "Hurry, hurry, I don't want to hurt anybody.  Hurry, hurry."  (TT II, 18, 21).  The man told Mr. Regan, "Now you don't want to see her get hurt, so don't do anything."  (TT II, 19).  Mr. Regan testified that he studied this individual very carefully, particularly his eyes.  "I was watching and looking at his eyes, very, very carefully.  Because a lot of times you can tell what a person's going to do by watching their eyes, and I wanted to know what he was going to do with that gun."  (TT II, 36).

All the money was out on the counter, so Mrs. Regan complied with the order, picked up the money and put it in the bag.  (TT II, 18).  Apparently unconvinced that he had taken all the store's cash, the gunman reached over the counter and lifted the money tray to make sure that no cash had been hidden underneath it.  (TT II, 19, 35).  Both victims were "within an arm's reach" of the gunman.  (TT II, 20, 35).  After finding no additional money, the man indicated that he was taking cigarettes, and stuffed two cartons of cigarettes into his duffel bag.  (TT II, 19, 36-37, 63).

When the gunman was at the exit and apparently ready to leave, he hesitated and made a remark about seeing traffic.  (TT II, 19, 37).  He waited, then opened the door and left.  The robber got away with about $650 and two cartons of cigarettes.  (TT II, 21).  Mr. Regan locked the door and told his wife to call 911.  (TT II, 37).  Mr. Regan looked outside and saw a car "parked up the hill and just a little bit front the store on the side of the road."  (TT II, 37).  It was an "older-style car" with "square-type taillights."  (TT II, 37).  Mr. Regan could see the rear end of the car, but could not tell how many doors it had.  The car was white.  (TT II, 49).  He did not see the robber get into the car, but suspected that he was in it because the car took off at a high rate of speed.  (TT II, 49-50,

69).  Raymond Regan decided to chase after the car in his pick-up truck in an effort to get the license plate number.  (TT II, 38).  He never got closer than 100 yards from the suspected getaway vehicle.  (TT II, 38, 51).  His pursuit ended when he failed to reduce speed for a corner and his truck slid off the road into the ditch.  (TT II, 21, 37, 51).

Mrs. Regan identified petitioner in court as the man who had robbed her at gunpoint.  (TT II, 22-23).  She was "[p]ositive" that petitioner was the robber.  (TT II, 23)  Earlier she had picked petitioner out of a lineup conducted at the Kent County jail.  (TT II, 23).  Mr. Regan was "positive" in his in-court identification and in the identification he made during the lineup.  (TT, 38-39, 41).

Mr. and Mrs. Regan testified that they had been kept apart during the lineup and that no suggestions had been made regarding which individual they should choose. (TT II, 25-26, 39).  Mrs. Regan testified that as soon as petitioner came through the door, even before the rest of the men in the lineup had entered, she recognized petitioner as the armed robber.  (TT II, 30-31).  She had no doubt.  (TT II, 24).  DeLynn Regan identified petitioner through his "distinctive voice."  (TT II, 25).  She also identified him by his facial features: "[W]ell, like I said, you know, you could see a little bit of his hair.  But he had, as you see in the photo, um kind of a strawberry blonde.  The eyebrows were the same color.  The skin, the lighter, that goes with that kind of red hair."  (TT II, 25).  She testified that petitioner's hood had not covered much during the robbery and that she had been able to see all of petitioner's face.  (TT II, 27).

Mr. Regan testified that he knew petitioner was the robber "when he walked in the room" for the lineup.  (TT II, 41).  He also recognized petitioner's voice.  (TT II, 41).  During the robbery, Mr. Regan had not been able to see petitioner's mouth, but he had seen his eyes and

eyebrows, light complexion, and hair color. He knew the gunman's approximate height and weight. (TT II, 36, 43). Mr. Regan testified that his identification of petitioner was based on what he "had been trained to do." (TT II, 55). He stated: "I am a licensed instructor for personal protection. We teach people that you've got to be observant of your surroundings, what's going on around you, and who is approaching you and not approaching you." (TT II, 55). Mr. Regan had applied this technique and carefully focused on the gunman so if he later had the opportunity to identify him, he could do so. (TT II, 56-57).

Detective Stephen Moon of the Kent County Sheriff's Department provided additional testimony regarding the line-up procedure. Moon did not prepare the lineup for any suspect. The arrangements are made by a property deputy at the jail. (TT II, 88). In addition, two attorneys are present during lineups to help maintain non-suggestive procedures: a criminal defense attorney and an attorney from the prosecutor's office. (TT II, 88). Detective Moon gave the following summary of how Mr. and Mrs. Regan identified petitioner as the robber:

Q      Now can you describe for the jury, when you have more than one witness that's going
       to view a lineup, do you -- how do you conduct it? Do you want them discussing it?
       Do you want them particularly when they go in the room -- explain to the jury what
       your aim is here.

A      Clearly you don't want them to discuss it. We want an independent identification all
       on their own. Deputy Zlydaszyk goes through the instructions prior to that.
       Basically, what I've been told is to keep my mouth shut, I'm there just to handle
       some paperwork type thing. So they're not questioned, they're not directed in any
       way. We first meet in a room outside of where the lineup is actually performed.
       Again, there isn't any discussion whatsoever about who to pick or anything like that.
       From that point we go inside the actual viewing room which is a darkened room with
       a one-way mirror, I believe, is basically what it is. And then the lineup enters from
       another door having their numbers. Once they view a frontal view and they turn
       sideways, they turn sideways, and it's not uncommon for them to say certain things.

In this particular incident, we had them say -- all of them said, "Hurry up, ma'am," because that seemed to be a common element that was used in this particular case.

* * *

In this particular case when we had two people that viewed the lineup, we took one out at a time. And I was actually the one that took them in the next room. There's a small little card, and I put the card in front of them. And if the suspect is there, the number that the suspect is, they write that number down. And then it is initialed by the attorneys that were there.

Q   Did you in any way try to suggest to Mr. and Mrs. Regan who to pick, or that the person was in there, or anything of this nature?

A   Absolutely not.

Q   Did Mr. and Mrs. Regan view the physical lineup?

A   Yes.

Q   Did you have them both come into the room afterwards, then, and write down? Or how did you conduct it?

A   They took -- I took one out at a time, one out at a time. The card was set. No discussion was made other than, if the suspect is there, write the number down. And I don't remember which one was brought out first or which one was brought out second now, but they were brought out at different times.

Q   Let's start with just Mrs. Regan. Did you give her the card?

A   Yes.

Q   And did she put down a number?

A   Yes.

Q   Who did she identify?

A   No. 2.

Q   And is that the defendant, Mr. Robinson?

A   Yes.

Q       Did she pause?  Did it take her a long time to do it?

A       No, there was no pause.  It was -- as soon as the card was in front of her and the pen was laid down, actually for both of them, there was no hesitation.

Q       So for both of them, they picked No. 2, Mr. Robinson, the defendant that is before the Court today.

A       That's correct.

Q       And didn't hesitate or indicate that they weren't sure or anything of this nature?

A       No.

(TT II, 89-92).

Detective Moon testified regarding other aspects of his investigation.  Petitioner's residence was six or seven miles from the location of the robbery.  (TT II, 86).  Moon estimated that in about half of the armed robberies he had investigated, there had been a "get-away driver."  (TT II, 101).  The detective received a lead on a possible accomplice from James Eller, an inmate at the Brooks Correctional Facility.  (TT II, 96-97).  Eller gave a statement to Detective Moon indicating that Thomas Grantham was involved in the armed robbery and had been accompanied by a red-haired individual.  (TT II, 98).  Eller later told Moon that he had not been truthful and had made up the information in his statement.  (TT II, 98-99).  Grantham's attorney contacted Detective Moon and stated that his client had information regarding an armed robbery and was looking to exchange that information for "consideration" on "some charges that he was going through."  (TT II, 96).  Eller and Grantham were "basically, pointing fingers at each other" for various crimes.  (TT II, 106).  Neither Eller nor Grantham fit the description of the man who had robbed Mr. and Mrs. Regan.  (TT II, 102).

During cross-examination, petitioner's attorney questioned Detective Moon about the impoundment of petitioner's vehicle.

> Q        Okay, all right, thank you.  Now at some point you had the opportunity to impound Mr. Robinson's vehicle, correct?
>
> A        I did not impound the vehicle.  It was already impounded for some other incident.
>
> Q        What kind of a vehicle was that?
>
> A        Baretta.  Chevy Baretta.
>
> Q        It wasn't a white vehicle?
>
> A        No.
>
> Q        And what items were found in the vehicle that related to this incident, if any?
>
> A        Um, the items that were taken out of the vehicle for this specific incident?
>
> Q        Um-hum.
>
> A        The only thing that I can say, there was a smashed pack of Basic Light cigarette carton, smashed, empty.

(TT II, 107-08).  On redirect, Detective Moon stated that the significance of the crushed carton or package found in petitioner's vehicle was that "Basic" was one of the brands reported stolen from the store.  (TT II, 111).  He testified that the empty carton was not listed on the original property receipt.  It was later in the investigation that Moon learned the brand of cigarettes taken from the store.  Petitioner's car was still in the impound.  Detective Van Dyke went back to the car, retrieved the empty package, and it was recorded on a different property receipt.  (TT II, 112-13).  On recross-examination, Detective Moon conceded that Basic was a common brand of cigarettes and that similar packages were available for purchase in Kent County.  (TT II, 112).

After the close of the prosecution's proofs, petitioner's attorney made a motion for a mistrial.  (TT III, 3, docket # 14).  She argued that the prosecutor had failed to disclose the report indicating that the cigarette package had been found in petitioner's car and a report regarding Detective Moon's interviews with Eller and Grantham.  Petitioner's attorney argued if she had been able to obtain these reports on time, she would have had the opportunity to make further investigations into these facts and possibly obtain evidence that was favorable to petitioner's defense. (TT III, 4).  The prosecutor responded that he did not have any prior knowledge of the reports and, in any event, they were not exculpatory:

> I don't believe that there is any exculpatory evidence that was kept from the defense. Obviously, the cigarette package I was not aware of prior to the trial here, and I think the reports that Ms. Kelley is referring to are reports that didn't come over in the initial package of materials that we based the issuance of a warrant on.  They are reports that would develop later and that I did not have knowledge of.  We've had a chance to go through the statements of Mr. Eller and Mr. Grantham that defense counsel has referred to.  What those statements mainly consist of are those two individuals pointing the finger at one another, one alleging that one was involved in breaking and entering of churches, one involved in the breaking and entering of a chiropractic office.  There is a lot of material in there, none of it which really pertains to this particular incident.

(TT III, 5-6).  Judge Dennis B. Leiber denied the motion for a mistrial, finding that the prosecution was not at fault, because Detective Moon failed to bring these reports to the prosecutor's attention:

> THE COURT:  My understanding is that there was information communicated to the jury in examination of the investigating officer from a report not presented to the prosecution or defense.  I do not see evidence that the prosecution withheld from the defense anything that was in his possession up to and including the course of this trial, and for that reason, I respectfully deny the motion.

(TT III, 7).

The attorneys delivered their closing arguments and Judge Leiber gave his instructions. (TT III, 9-39). It took the jury less than an hour to find petitioner guilty of two counts of armed robbery. MICH. COMP. LAWS § 750.529. (TT III, 42-45).

On April 12, 2007, Judge Leiber conducted a sentencing hearing. The victims gave brief statements and petitioner expressed his disagreement with the jury's verdict. (Sentencing Transcript (ST), 5-7, docket # 15). Judge Leiber stated: "I was the judge that presided over this trial, and there's no question in my mind based on the evidence presented you are, in fact, guilty of the offense for which you stand convicted today. You heard from the two people, the effect of your actions on them, and the need for society to be protected from this conduct." (ST, 8). Judge Leiber sentenced petitioner as a fourth habitual offender, to 33-to-50 years for each count of armed robbery, with the sentences to be served concurrently. (ST, 9; Judgment of Sentence Commitment to Department of Corrections, found in Michigan Court of Appeals record, docket # 16).

**B.     Appellate Review**

Petitioner appealed as of right to the Michigan Court of Appeals. On appeal, petitioner was represented by Attorney Desiree Ferguson of the State Appellate Defender Office. Appellate counsel raised the following issues:

I.     WAS MR. ROBINSON DENIED DUE PROCESS WHEN THE TRIAL COURT ALLOWED IDENTIFICATION TESTIMONY BASED ON A PRE-TRIAL LINEUP THAT WAS IMPERMISSIBLY SUGGESTIVE AND PRESENTED A SUBSTANTIAL LIKELIHOOD OF MISIDENTIFICATION, AND WHERE THE COURT ALLOWED A COURTROOM IDENTIFICATION THAT LACKED AN INDEPENDENT BASIS; AND WAS TRIAL COUNSEL INEFFECTIVE FOR FAILING TO SEEK SUPPRESSION OF THE IDENTIFICATION EVIDENCE?

II.     WAS MR. ROBINSON DENIED DUE PROCESS WHEN THE TRIAL COURT
        DENIED A MOTION FOR NEW TRIAL PREMISED ON THE PROSECUTOR'S
        FAILURE TO DISCLOSE EXCULPATORY EVIDENCE?

(Statement of Questions Presented, Defendant-Appellant's Brief at iv, found in Michigan Court of

Appeals record, docket # 16).

On July 1, 2008, the Michigan Court of Appeals affirmed petitioner's convictions

and sentence. (7/1/08 Op., docket # 16). The Court of Appeals found no merit in petitioner's

challenge to the identification testimony and the related claim of ineffective assistance of counsel:

> Defendant first argues that the in-court identifications of defendant by two witnesses should
> not have been allowed because they were based on an impermissibly suggestive pre-trial
> lineup. Specifically, he claims that his unique features--reddish hair and eyebrows coupled
> with a light complexion--substantially distinguished him from the other people in the lineup.
> Defendant did not object or move to suppress the evidence; therefore, review is precluded
> absent manifest injustice. *People v Whitfield*, 214 Mich App 348, 351; 543 NW2d 347
> (1995). Defendant further asserts that counsel provided ineffective assistance in failing to
> object to or move for suppression of this evidence. Review of this issue must be based on
> the existing record. *People v Cox*, 268 Mich App 440, 453; 709 NW2d 152 (2005). If there
> is insufficient detail in the record to support an ineffective assistance claim, the issue is
> effectively waived. *People v Sabin*, 242 Mich App 656, 659; 620 NW2d 19 (2000).
>
> The fairness of an identification procedure is evaluated in light of the total circumstances to
> determine whether the procedure was so impermissibly suggestive as to render the
> identification irreparably unreliable. *People v Kurylczyk*, 443 Mich 289, 311-312; 505
> NW2d 528 (1993). If a witness is exposed to an impermissibly suggestive pretrial lineup,
> an in-court identification of the defendant should be disallowed unless there is clear and
> convincing evidence of a sufficiently independent basis to purge the taint of the improper
> identification.
>
> *People v Gray*, 457 Mich 107, 115; 577 NW2d 92 (1998). "Differences among participants
> in a lineup
>
>> are significant only to the extent they are apparent to the witness and substantially
>> distinguish defendant from the other participants in the line-up. . . . It is then that
>> there exists a substantial likelihood that the differences among line-up participants,
>> rather than recognition of defendant, was the basis of the witness' identification.
>> (*People v James*, 184 Mich App 457, 466; 458 NW2d 911 (1990), vacated on other
>> grounds 437 Mich 988; 469 NW2d 294 (1991). [*Kurylczyk, supra* at 312].

"Physical differences generally relate only to the weight of an identification and not to its admissibility." *People v Hornsby*, 251 Mich App 462,466; 650 NW2d 700 (2002).

Although defendant was the only lineup participant with reddish hair and eyebrows, one witness testified that she recognized defendant, who was stationed at position number 2 in the lineup of five men, before the other participants even entered the room. The other witness recognized him "immediately." Moreover, both recognized his voice, which was distinctive. Further, one of the witnesses was a licensed instructor for personal protection, who taught people to be extremely observant of approaching people, and who was practicing this instruction at the time of the robbery so that he would be able to subsequently identify the robber. He testified that he watched the robber's eyes very closely "because a lot of times you can tell what a person's going to do by watching their eyes, and I wanted to know what he was going to do with that gun." Under the totality of these circumstances, there was no substantial likelihood that the differences among line-up participants, rather than recognition of defendant, were the basis of the witnesses' identification. Accordingly, there was no manifest injustice. *Whitfield*, *supra* at 351. Moreover, since an objection or motion to suppress would likely have been futile, there was no ineffective assistance of counsel based on the failure to take these actions. *See People v Fike*, 228 Mich App 178, 182; 577 NW2d 903 (1998). The result of the proceedings would not have been different. *People v Carrick*, 220 Mich App 17, 22; 558 NW2d 242 (1996). Finally, the alternative approach of focusing on the dissimilarities of those in the lineup appears to have been a sound tactical decision. *People v LaVearn*, 448 Mich 207, 213-214; 528 NW2d 721 (1995).

(Op. at 1-2).

The Michigan Court of Appeals rejected petitioner's claim that a *Brady* violation had occurred arising from the prosecution's intentional suppression of Detective Moon's reports. (Op. at 2). It found that Detective Moon's reports "had never been provided to the prosecution or the defense." (*Id.*). Further, the evidence in question "would not have been favorable to defendant" and "would not have led a jury to entertain a reasonable doubt about defendant's guilt." (*Id.*).

Petitioner sought review of the same issues in Michigan's highest court. On October 27, 2008, the Michigan Supreme Court denied petitioner's application for discretionary review. (10/27/08 Order, found in Michigan Supreme Court record, docket # 17).

C.     Habeas Corpus Petition

On March 19, 2009, petitioner filed his petition for federal habeas corpus relief. He raises the grounds rejected by the Michigan Court of Appeals.

## Standard of Review

Because petitioner filed his habeas application long after the April 1996 enactment of the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 ("AEDPA"), the provisions of that law govern the scope of the court's review. *See Penry v. Johnson*, 532 U.S. 782, 791 (2001). AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). AEDPA "dictates a highly deferential standard for evaluating state-court rulings which demands the state court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (citations omitted); *see Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (*per curiam*); *Felkner v. Jackson*, 131 S. Ct. 1305, 1307 (2011) (*per curiam*); *Renrico v. Lett*, 130 S. Ct. 1855, 1862 (2010). "AEDPA requires heightened respect for state court factual and legal determinations." *Lundgren v. Mitchell*, 440 F.3d 754, 762 (6th Cir. 2006). If a state court adjudicated the claim, deferential AEDPA standards must be applied. 28 U.S.C. § 2254(d); *see Premo v. Moore*, 131 S. Ct. 733, 739 (2011); *Waddington v. Sarausad*, 555 U.S. 179, 190 (2009); *Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009) (("[A]ny claim that was adjudicated on the merits in State court proceedings' is subject to AEDPA deference.") (quoting 28 U.S.C. § 2254(d)).

AEDPA prevents federal habeas "retrials" and ensures that state court convictions are given effect to the extent possible under law. *Bell v. Cone*, 535 U.S. at 693-94. It prohibits "using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."

-13-

*Parker v. Matthews*, 132 S. Ct. 2148, 2149 (2012)(*per curiam*). The AEDPA standard is difficult

to meet "because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011); *see*

*Metrish v. Lancaster*, No. 12-547, __ S. Ct. __, 2013 WL 2149793, at * 5 (U.S. May 20, 2013);

*Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). "Section 2254(d) reflects the that habeas corpus

is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for

ordinary error corrections through appeal." *Harrington*, 131 S. Ct. at 786. Section 2254(d) states

that an application for a writ of habeas corpus on behalf of a person who is incarcerated pursuant to

a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in

state court unless the adjudication "(1) resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the Supreme Court

of the United States;[1] or (2) resulted in a decision that was based upon an unreasonable determination

of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d);

*see Metrish v. Lancaster*, 2013 WL 2149793, at * 5; *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2259

(2010).

---

[1] Under this standard, a lower court must ground its decision on the "holdings" as opposed
to the "dicta," of Supreme Court decisions as of the time of the relevant state-court decision. *Howes
v. Fields*, 132 S. Ct. 1181, 1187 (2012). "[C]ircuit precedent does not constitute 'clearly established
Federal law, as determined by the Supreme Court[.]' 28 U.S.C. § 2254(d)(1). It therefore cannot
form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 132 S. Ct. at 2155; *see
Marshall v. Rogers*, 133 S. Ct. 1446, 1450-51 (2013).

<u>**Discussion**</u>

**I.     Supplement to the Petition and/or Brief**

Petitioner filed his petition for federal habeas corpus relief in 2009.  He raises the issues rejected on direct appeal by the Michigan Court of Appeals.  Because the state Court of Appeals decided these claims on their merits, the habeas corpus court is restricted to the record presented to the state Court of Appeals.  *See Cullen v. Pinholster,* 131 S. Ct. 1388, 1400-01 (2011); *see also Ballinger v. Prelesnik*, 709 F.3d 558, 561 (6th Cir. 2013).

On April 12, 2012, petitioner sent a letter addressed to Chief Judge Maloney, attaching a number of documents which he identified as a "supplement" to his petition and/or brief. (docket # 28).  Petitioner asserted that he "just found out about this information, so it could not be submitted with the pending brief" and claimed "[t]his is an issue of actual innocence."  (*Id.* at ID# 149).

Petitioner's statement that he "just found out" about the documents is demonstrably false.  The documents were well known to petitioner and his attorney at the time of trial.  Petitioner's attorney used the statements Mr. and Mrs. Regan gave to the police in cross-examination.  (TT II, 27-28, 44).  She made extensive use of the lineup photograph in cross-examination, but was unable to convince the jury the other men in the lineup were so different in their appearance that the victims' identification of petitioner as the robber should not be trusted.  (TT II, 29-30, 52-53).  The "road rage" incident which had occurred on the same day as the robbery and involved a white car was well known to all parties.  (TT II, 63-65, 68-74).  Petitioner's attorney asked Detective Moon a number of questions about the road rage incident, but there was no evidence connecting it to the armed robbery.  (TT II,108-10).  Petitioner's attorney elicited testimony from Detective Moon that prisoner

Eller had not picked petitioner out of a lineup. (TT II, 107). Defense counsel's closing argument featured the cross-examination testimony that she had elicited from witnesses based on the documents attached to petitioner's letter. (TT III, 18-23). The papers attached to petitioner's letter to Chief Judge Maloney are not "new."

Further, assuming that these materials could somehow be considered at this late date, they could not possibly establish actual innocence. "[A] claim of actual innocence is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claims considered on the merits." *Herrrera v. Collins*, 506 U.S. 390, 404 (1993); *see Schlup v. Delo*, 513 U.S. 298, 315 (1995). Petitioner's claims have been rejected on the merits rather than on procedural grounds. As a consequence, his belated gateway claim of actual innocence is both unnecessary and unavailing. Petitioner's claims must be decided on the basis of the record presented to Michigan's courts. *Cullen v. Pinholster,* 131 S. Ct. at 1400-01.

## II.    Due Process Challenge to the Identifications Made By the Victims

In ground I, petitioner claims a due-process violation arising from an impermissibly suggestive pretrial identification. Because the state Court of Appeals ruled directly on this claim, its decision is subject to deference under AEDPA. Habeas relief can be granted only if the state-court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law enunciated by the Supreme Court. 28 U.S.C. § 2254(d)(1). A state court's legal decision is contrary to clearly established federal law if it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or decides a case differently from the Supreme Court on a set of materially indistinguishable facts. *See Williams v.*

*Taylor*, 529 U.S. 362, 413 (2000). Petitioner cannot meet this high standard. The state Court of Appeals enunciated the appropriate constitutional test, citing state cases that embody the federal constitutional standard. Under federal law, a conviction based on identification testimony following a pretrial identification violates due process only when the pretrial identification procedure is so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1986). If a criminal defendant is successful in showing that a pretrial identification was unduly suggestive, then the court must determine whether, under the totality of the circumstances, the identification was nonetheless reliable and therefore admissible. *Manson v. Brathwaite*, 432 U.S. 98, 106 (1977). In the present case, the Michigan Court of Appeals found that the pretrial identification procedure was not unduly suggestive and "[u]nder the totality of the circumstances, there was no substantial likelihood that the differences among the line-up participants, rather than recognition of the defendant, were the basis of the witness' identification." (Op. at 2). This conclusion is supported by the factual record and does not violate any legal principles enunciated by the Supreme Court.

        In a related claim, petitioner asserts that his trial counsel was ineffective for failure to seek suppression of the pretrial identification. (Pet. Brief at 24-28). Claims of ineffective assistance of counsel are measured under the standards established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). Petitioner must prove (1) that counsel's performance fell below an objective standard of reasonableness and (2) that counsel's deficient performance prejudiced defendant resulting in an unreliable or fundamentally unfair outcome. 466 U.S. at 687-88. In adjudicating the first prong of the standard, the court must judge the

reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.

The court should recognize that counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." 466 U.S. at 690. The Sixth Amendment is violated only if counsel's acts or omissions "were outside the wide range of professionally competent assistance." *Id.* Strategic choices after thorough investigation of law and facts relevant to plausible options are "virtually unchallengeable." *Id.* As for prejudice, the court focuses on whether "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). "[T]he defendant must show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

Because the Court of Appeals decided petitioner's claims of ineffective assistance of counsel on their merits, its decision must be afforded deference under AEDPA. *See Harrington v. Richter*, 131 S. Ct. at 784; *Bourne v. Curtin*, 666 F.3d 411, 414 (6th Cir. 2012). To receive habeas relief, petitioner must demonstrate that the state court's decision was contrary to, or represented an unreasonable application of, *Strickland v. Washington*. *See Bell v. Cone*, 535 U.S. 685, 698-99 (2002). Hence, it is not enough to convince the federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. Rather, petitioner must show that the state court "applied Strickland to the facts of his case in an objectively unreasonable manner." *Bell*, 535 U.S. at 699; *see Campbell v. Bradshaw*, 674 F.3d 578, 586–87 (6th Cir. 2012). This creates a "high burden" for petitioner. *See Carter v. Mitchell*, 443 F.3d 517, 525 (6th Cir. 2006); *see*

*also Bourne*, 666 F.3d at 414. "[B]ecause the Strickland standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). Supreme Court decisions describe this as "the doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard." *Knowles*, 556 U.S. at 123; *see Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003) (*per curiam*).

The decision of the Michigan Court of Appeals easily withstands scrutiny under the "doubly deferential" standard. An attempt to suppress the identifications at issue "would likely have been futile." (Op. at 2). Counsel's failure to make a frivolous or meritless motion or objection does not constitute ineffective assistance of counsel. *See Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010); *O'Hara v. Brigano*, 499 F.3d 492, 506 (6th Cir. 2007). Further, petitioner's attorney made a "sound tactical decision" to attack the victims' identification of petitioner by "focusing on the dissimilarities of those in the lineup." (Op. at 2). Petitioner suffered no prejudice because "the result of proceedings would not have been different" if his attorney had filed a motion to suppress the identifications made by Mr. and Mrs. Regan. (*Id.*).

### III. Due-Process Challenge Based on Failure to Disclose Exculpatory Evidence

In ground II, petitioner claims a due-process violation arising from the prosecutor's failure to disclose exculpatory evidence. Because the state Court of Appeals ruled directly on this claim, its decision is subject to deference under AEDPA. Habeas relief can be granted only if the state-court proceedings resulted in a decision that was contrary to, or involved an unreasonable

application of, clearly established federal law enunciated by the Supreme Court. 28 U.S.C. § 2254(d)(1).

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (quoting *Cone v. Bell*, 556 U.S. 449, 469-70 (2009)). The fact that the evidence at issue was not known to the prosecutor is not fatal to petitioner's claim of *Brady* violation because the rule "encompasses evidence known only to police investigators and not to the prosecutor." *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that the evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler*, 527 U.S. at 282. The Michigan courts found that the prosecution had not suppressed evidence, that the information had not been exculpatory, and that petitioner suffered no prejudice. (Op. at 2). The state-court finding of no due-process violation easily withstands scrutiny under the deferential AEDPA standard.

**Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied.


Dated:   May 22, 2013                    /s/  Joseph G. Scoville
                                         United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely and specific objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir.), *cert. denied*, 129 S. Ct. 752 (2008); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).   General objections do not suffice.  *Spencer v. Bouchard*, 449 F.3d 721, 724-25 (6th Cir. 2006); *see Frontier*, 454 F.3d at 596-97; *McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006).